**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

BRIAN McHUGH and ELIZABETH McHUGH,

Plaintiffs,

v.

ALMER TOWNSHIP; GREG FESTIAN, in his individual and official capacity; and JIM MANTEY, in his individual and official capacity,

Defendants.

Case No.
Judge

---

KEMP KLEIN LAW FIRM
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
201 W. Big Beaver Road, Suite 600
Troy, MI 48084
(248) 528-1111
robert.zawideh@kempklein.com

---

# COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

NOW COME the Plaintiffs Brian McHugh and Elizabeth McHugh, through their attorneys, The Kemp Klein Law Firm, by attorney Robert S. Zawideh, and for their Complaint set forth the following:

## NATURE OF THE ACTION

This civil-rights and supplemental state-law action arises from Defendants' refusal to perform two ministerial acts concerning three residentially zoned parcels in Almer Township that Plaintiffs operated as licensed residential child-care homes for seven years with the Township's approval. First, when Plaintiffs contracted to

sell the parcels, Defendants unjustifiably delayed and obstructed the buyer's special use permit until the buyer terminated the $1.2 million purchase. Second, when Plaintiffs sought to resume their own operations, Defendants refused to issue the written zoning verification — confirming the Property's residential zoning and the permitted status of the existing use — that Michigan requires for Plaintiffs to complete state licensure. The homes serve children who are victims of abuse and/or neglect, who have been removed from their homes, and who have been diagnosed with mental-health and behavioral disabilities. Plaintiffs seek relief under 42 U.S.C. § 1983 (procedural and substantive due process), the Fair Housing Act, the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, the Takings Clause (and Michigan inverse condemnation), and supplemental Michigan claims for tortious interference and equitable estoppel.

## JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343.

2. The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

3. Venue lies in this District and Division because the parcels are in Tuscola County and the events occurred there. The parcels are located at 336, 376, and 390 E. Deckerville Rd., Almer Township, Tuscola County, Michigan.

## PARTIES

4. Plaintiffs Brian McHugh and Elizabeth McHugh are individuals who own three contiguous parcels of land located at 336, 376, and 390 E. Deckerville Rd., Almer Township, Tuscola County, Michigan (collectively, the "Property"), which have historically been referred to together as 390 E. Deckerville Rd.

5. Defendant Almer Township is a Michigan charter township in Tuscola County.

6. Defendant Greg Festian is the Township's zoning administrator, responsible for administering and enforcing the Township's zoning ordinance, including the issuance of written zoning verifications, and is sued in his individual and official capacities.

7. Defendant Jim Mantey is the Township's chief administrative officer and is sued in his individual and official capacities.

## BACKGROUND AND STATEMENT OF FACTS

8. The Property lies within a residential zoning district. Under Michigan law and the Township's zoning ordinance, a state-licensed residential facility serving ten or fewer residents is a residential use permitted as of right in a residential district; it requires neither rezoning nor a special use permit.

9. From 2016 to 2022, Plaintiffs operated the three homes on the Property as separately licensed Child Caring Institutions / Qualified Residential Treatment Programs ("CCI/QRTP"), certified by the State of Michigan through Child Welfare Licensing and the Department of Health and Human Services, each housing ten or

fewer residents. Plaintiffs operated lawfully and without objection throughout that period.

10. The Township previously approved the building permits and construction of two of the homes specifically to facilitate this multi-licensed residential configuration.

11. In reliance on the Township's approvals and on the Property's residential zoning and permitted-use status, Plaintiffs invested substantial resources acquiring, constructing, and equipping the three homes as specialty residential child-care facilities that have no other practical use, and operated them as licensed CCIs/QRTPs for seven consecutive years.

12. The intended residents of the homes are homeless children who are victims of abuse and neglect, wards of the court, having diagnosed mental-health and behavioral disabilities. Those impairments substantially limit one or more major life activities, including learning, concentrating, caring for themselves, and interacting with others. The residents are therefore persons with a handicap under the Fair Housing Act and individuals with a disability under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

13. Plaintiffs own and operate the homes for the benefit of, and maintain a direct relationship and association with, these disabled residents, and Plaintiffs' use and enjoyment of the Property depends on housing them and providing comprehensive care for all their needs, including trauma informed mental health treatment.

14. In July 2025, Plaintiffs accepted an offer from Scioto Properties LLC, an Ohio limited liability company ("Scioto"), to purchase the three parcels for $1.2 million. The Purchase and Sale Agreement ("PSA") is attached as **Exhibit 1**.

15. Following execution of the PSA, Scioto applied to the Township for a special use permit for its intended residential use of the parcel.

16. Although Scioto satisfied all requirements for the permit, Defendants affirmatively delayed and obstructed Scioto's application, without justification, until Scioto was unable to close. Scioto terminated the purchase as a direct result of the Township's conduct. The Termination Agreement is attached as **Exhibit 2**.

17. Scioto withdrew from the $1.2 million transaction solely because of the Township's delay, obstruction, and refusal to cooperate.

18. After the sale failed, Plaintiffs sought to resume their own CCI/QRTP operations on the Property. Plaintiffs plan to resume operations at all three parcels, each housing ten or fewer residents, with current licensure status "Pending Enrolled Application."

19. There are no new buildings, structural changes, footprint modifications, or change in use. Plaintiffs seek only to return to the identical residential-care framework the Township previously permitted and that operated for seven years.

20. The State of Michigan requires the zoning administrator's written verification — confirming the Property's residential zoning and that CCI/QRTP use is a permitted use — before Plaintiffs can complete CCI licensure and QRTP contracting.

21. Confirming the permitted status of an existing, residentially zoned use is a ministerial act. Once the residential zoning and permitted-use status are confirmed, the zoning administrator has no discretion to withhold the verification.

22. Plaintiffs presented the specifics for all three homes at the Township Planning Commission meeting and submitted a written request to the zoning administrator for the written zoning verification.

23. The Township refused to act. At the June 2026 Planning Commission meeting the Township adjourned for lack of quorum, gave no written explanation, and has never responded to or acted upon Plaintiffs' written verification request.

24. The Township's refusal is final. The Township has committed to a definitive position of non-issuance, has provided no avenue by which that position might be reconsidered or changed, and any further request would be futile. There is no question how the Township's zoning regulations apply to the Property.

25. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered injury, including the loss of the $1.2 million Scioto sale, the inability to resume licensed operations, lost business and income, and ongoing delay and carrying costs.

## COUNT I — 42 U.S.C. § 1983: PROCEDURAL DUE PROCESS (AGAINST ALL DEFENDANTS)

26. Plaintiffs incorporate the preceding paragraphs by reference.

27. Plaintiffs have a protected interest in the continued and resumed residential CCI/QRTP use of the Property: a use permitted as of right that Plaintiffs vested

through the Township's prior approvals, their substantial investment in specialty facilities, and seven years of lawful operation in reliance on that zoning. Second, Plaintiffs have a protected interest in the written zoning verification itself, which is a ministerial act the zoning administrator has no discretion to withhold once the Property's residential zoning and permitted-use status are confirmed.

28. Defendants, acting under color of state law, deprived Plaintiffs of these interests without due process. The Township refused to issue any decision or written verification, adjourned for lack of quorum, gave no explanation, and remained nonresponsive, denying Plaintiffs any meaningful notice or opportunity to be heard.

29. The deprivation singled out Plaintiffs and the Property on individual grounds and did not result from any generally applicable legislative determination.

30. The deprivation was caused by an official policy or decision of Almer Township. The Township's Planning Commission and zoning administrator possess final authority over the requested zoning verification and are the Township's final policymakers for that purpose; their decision to refuse is the Township's policy.

31. Defendants Festian and Mantey personally participated in, directed, or were responsible for the refusal and resulting deprivation.

32. Because the allegedly infirm process is itself the injury, Plaintiffs' procedural due process claim is ripe without any further or final land-use decision.

33. As a direct and proximate result, Plaintiffs suffered injury, including the lost-sale damages arising from the $1,200,000 price net of the parcels' retained fair market value, business interruption in addition to carrying costs, lost income and

delay costs, and are entitled to declaratory and injunctive relief, damages, and attorneys' fees under 42 U.S.C. § 1988.

**Count II — Fair Housing Act, 42 U.S.C. § 3604(f)**
**(Against Almer Township)**

34. Plaintiffs incorporate the preceding paragraphs by reference.

35. The intended residents of the homes are persons with a handicap within the meaning of the Fair Housing Act. The Act applies to municipalities' administration of their zoning and land-use regulations, and it is unlawful to make a dwelling unavailable to, or otherwise discriminate against, a person because of the handicap of an intended resident.

36. Issuing the written zoning verification or otherwise confirming that the existing residential use is permitted is a reasonable accommodation that is necessary to afford the disabled residents an equal opportunity to use and enjoy a dwelling and obtain necessary mental health treatment. But for the accommodation, the residents will be denied housing they would otherwise occupy. The accommodation imposes no undue financial or administrative burden and works no fundamental alteration of the Township's zoning scheme; it requires only the zoning administrator's signature confirming the Property's residential zoning and permitted use.

37. Defendants' refusal to act constitutes disparate treatment. The Township's refusal to confirm and permit Plaintiffs' residential use on the same terms it affords comparable residential uses occupied by persons without disabilities was motivated, at least in part, by the disabilities of the intended residents.

38. Plaintiffs have a direct relationship and association with the disabled intended residents, were injured by the Township's conduct, and have standing to assert these claims.

39. As a direct and proximate result, Plaintiffs suffered injury, and are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees.

**Count III — ADA Title II, 42 U.S.C. § 12132, and Sec. 504, 29 U.S.C. § 794**
**(Against Almer Township)**

40. Plaintiffs incorporate the preceding paragraphs by reference.

41. The intended residents of the homes are qualified individuals with a disability within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act.

42. Almer Township is a public entity under Title II of the ADA and is a recipient of federal financial assistance for purposes of Section 504.

43. By refusing to administer the zoning verification on equal terms, the Township excluded the intended residents from, and denied them the benefits of, the Township's zoning services, programs, and activities, and failed to make reasonable modifications to its zoning policies and practices, by reason of the residents' disabilities.

44. Plaintiffs have a direct relationship and association with the disabled intended residents and have standing to assert these claims.

45. As a direct and proximate result, Plaintiffs suffered injury, and are entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees.

**Count IV — 42 U.S.C. § 1983: Substantive Due Process (Against All Defendants)**

46. Plaintiffs incorporate the preceding paragraphs by reference.

47. Plaintiffs possess the constitutionally protected property interests described above.

48. Defendants' refusal to provide a ministerial verification for a use that is permitted as of right — after years of Township-approved, identical operation, with no change in use, structures, or footprint — was arbitrary and capricious, bore no rational relationship to any legitimate governmental interest, and was an abuse of governmental power.

49. The Township's sustained failure to act and non-response reflect a deliberate institutional decision, not an isolated error, and constitute the Township's official policy for Monell purposes.

50. As a direct and proximate result, Plaintiffs suffered injury, including the lost-sale damages arising from the $1,200,000 price net of the parcels' retained fair market value, business interruption in addition to carrying costs, lost income and delay costs, and are entitled to declaratory and injunctive relief, damages, and attorneys' fees under 42 U.S.C. § 1988.

**Count V — Regulatory Taking and Just Compensation, U.S. Const. amends. V & XIV (and, in the Alternative, Inverse Condemnation under the Michigan Constitution) (Against Almer Township)**

51. Plaintiffs incorporate the preceding paragraphs by reference.

52. Plaintiffs hold protected property and distinct investment-backed expectations in the established, income-producing residential use of the Property.

53. Through affirmative acts directed specifically at the Property — obstructing and delaying Scioto's special use permit, and affirmatively refusing to confirm the permitted status of Plaintiffs' existing use — the Township has interfered with those investment-backed expectations, imposed a severe economic impact, prevented the only practical use of specialty facilities built for this purpose, and destroyed a specific $1.2 million sale.

54. The Township has reached a final decision: its position of non-issuance is definitive, there is no further avenue to alter it, and the permitted uses of the Property are known to a reasonable certainty. Plaintiffs' takings claim is therefore ripe.

55. The Township's conduct constitutes a regulatory taking of Plaintiffs' property under the Fifth and Fourteenth Amendments to the United States Constitution for which just compensation is due. In the alternative, the Township's affirmative actions directed at the Property constitute an inverse condemnation under Article X, § 2 of the Michigan Constitution requiring just compensation.

**Count VI — Tortious Interference with Contract**
**(Against Defendants Festian and Mantey)**

56. Plaintiffs incorporate the preceding paragraphs by reference.

57. Plaintiffs had a valid and enforceable contract with Scioto — the PSA — for the sale of the three parcels for $1.2 million.

58. Defendants Festian and Mantey knew of the PSA and of Scioto's pending special use permit at all relevant times.

59. Festian and Mantey intentionally and improperly interfered with the contract. Their obstruction and delay of Scioto's permit application exceeded their lawful authority, was unjustified in law, and was undertaken with malice and for the purpose of defeating the transaction. These specific, affirmative acts corroborate the improper purpose of the interference. Because the duty to process and verify was ministerial, their conduct was not a protected exercise of discretion.

60. As a direct result, Scioto terminated the contract.

61. As a direct and proximate result, Plaintiffs suffered injury, including the lost-sale damages arising from the $1,200,000 price net of the parcels' retained fair market value, business interruption in addition to carrying costs, lost income and delay costs, and consequential losses.

**Count VII — Tortious Interference with Business Expectancy (Against Defendants Festian and Mantey)**

62. Plaintiffs incorporate the preceding paragraphs by reference.

63. Plaintiffs had a valid business relationship and expectancy with Scioto for the $1.2 million sale of the three parcels.

64. Defendants Festian and Mantey knew of that relationship and expectancy at all relevant times.

65. Festian and Mantey intentionally and improperly interfered with the expectancy through specific, affirmative acts — obstructing and delaying Scioto's

permit application beyond their lawful authority, with malice and unjustified in law — inducing Scioto to terminate the relationship.

66. As a direct and proximate result, Plaintiffs suffered injury, including the lost-sale damages arising from the $1,200,000 price net of the parcels' retained fair market value, business interruption in addition to carrying costs, lost income and delay costs, and consequential losses.

## COUNT VIII — EQUITABLE ESTOPPEL (AGAINST ALMER TOWNSHIP)

67. Plaintiffs incorporate the preceding paragraphs by reference.

68. The Township granted Plaintiffs official approvals — building permits, construction approval, and occupancy — for this exact residential use, and allowed Plaintiffs to operate the three homes as licensed CCIs/QRTPs for seven consecutive years.

69. Two of the homes were constructed and approved specifically for the multi-licensed residential configuration and cannot practically be put to any other use.

70. Plaintiffs reasonably and in good faith relied on those official approvals and the Property's residential zoning and expended significant resources constructing and operating specialty facilities in that reliance.

71. These are exceptional circumstances. Equity estops Almer Township from now denying that Plaintiffs' use is a permitted residential use and from refusing the ministerial verification for that identical use.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Brian McHugh and Elizabeth McHugh respectfully request that the Court:

A. Declare that Defendants' refusal to issue the written zoning verification violates Plaintiffs' rights under the United States Constitution, the Fair Housing Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

B. Enter preliminary and permanent injunctive relief requiring Almer Township to issue written zoning verification for 336, 376, and 390 E. Deckerville Rd. confirming the Property's residential zoning and that CCI/QRTP use with ten or fewer residents per home is a permitted use, and enjoining further obstruction;

C. Award compensatory damages, including the lost-sale damages arising from the $1,200,000 price net of the parcels' retained fair market value, business interruption in addition to carrying costs, lost income and delay costs, and consequential losses and other proven losses caused by Defendants' conduct;

D. Award just compensation on the takings and inverse-condemnation claim;

E. Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988, the Fair Housing Act, the ADA, and the Rehabilitation Act; and

F. Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

Dated: November 4, 2026

/s/Robert S. Zawideh
KEMP KLEIN LAW FIRM
By: Robert S. Zawideh (P43787)
Attorneys for Plaintiffs
201 W. Big Beaver Road, Suite 600
Troy, MI 48084 / (248) 528-1111
robert.zawideh@kempklein.com

# EXHIBIT 1

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made and entered into as of July 17, 2025 (the "**Effective Date**"), by and between **BRIAN AND ELIZABETH MCHUGH**, individual residents of the State of Michigan (collectively, "**Seller**")[1], and **SCIOTO PROPERTIES LLC**, an Ohio limited liability company, or its assignee ("**Purchaser**").

## Background Information

Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller that certain commercial real property consisting of that certain parcel of land in Tuscola County, Michigan and commonly known as **390 E. Deckerville Road, Caro, Michigan 48723**, as more particularly described on **Exhibit A** attached hereto and made a part hereof, together with all easements, rights, and appurtenances relating thereto, and all buildings, improvements and fixtures now or hereafter located thereon, and all of Seller's right, title, and interest in and to any streets, roadways, alleys, and/or sidewalks, both public and private, adjacent thereto (collectively, the "**Property**").

In connection with the purchase of the Property, Purchaser, or its affiliate, as lessor, must receive an executed written lease agreement for the Property (the "**Lease**") with Youth Opportunity Investments LLC, an Indiana limited liability company, or its assignee ("**Provider**"), as lessee. The Lease shall be effective on the Closing Date (as hereinafter defined), and shall be in form acceptable to Purchaser. Pursuant to the Lease, Provider will lease and operate the Property to provide residential treatment, support and related services to individuals with specialized continuing care needs for behavioral and mental health conditions (the "**Services**"). The individuals residing and receiving the Services at the Property are referred to herein as the "**Residents.**"

## Statement of Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto acknowledge and agree as to the accuracy of the Background Information, which is incorporated into this Agreement by reference, and hereby agree as follows:

## Article I.
## Purchase and Sale

**Section 1.1 Purchase and Sale.**

(a) Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, on the Closing Date (as hereinafter defined), the Property for a purchase price of One Million Two Hundred Thousand and no/100 Dollars ($1,200,000.00) (the "**Purchase Price**")

---

[1] Note to Seller: Please provide a copy of the vesting deed evidencing Seller's ownership of the Property. The GIS still reflects Aland Stamps as the owner of the Property.

provided that the property-level financial statements for the Property have been provided by Seller to Purchaser and are reasonably acceptable to Purchaser. The Purchase Price (as adjusted pursuant to this Agreement) shall be payable on the Closing Date by cash, check or wire transfer of immediately available federal funds.

(b) A total cash deposit of Thirty-Six Thousand and no/100 Dollars ($36,000.00) shall be paid to, and held in escrow with Commonwealth Land Title Insurance Company at its office located at 312 Walnut Street, Suite 2250, Cincinnati, Ohio 45202 (the "**Title Company**") within three (3) business days of the Effective Date (together with any interest thereon, the "**Deposit**"). If Purchaser fails to timely deliver the Deposit as required herein and such failure continues for a period of ten (10) days after written notice from Seller, then Seller may (as its sole remedy with regard to such default) terminate this Agreement by written notice to Purchaser at any time prior to Purchaser's actual delivery of the Deposit to the Title Company. The Deposit shall be held by the Title Company in a fully FDIC-insured account or accounts using Purchaser's tax identification number, and such account shall have no penalty for withdrawal. Any interest earned and accrued on the Deposit shall follow the Deposit. Except as otherwise provided in this Agreement, the Deposit shall be applied to the Purchase Price at Closing. The Deposit shall be paid by immediately available funds by wire transfer or similar means. The Deposit shall be held by the Title Company until the earlier of (a) Closing, in which case the Deposit shall be credited to Purchaser; (b) the exercise of a permitted right of termination by Purchaser under this Agreement, after expiration of any applicable notice and cure periods as set forth herein, in which event the Deposit shall be promptly returned to Purchaser; or (c) a default by Purchaser under this Agreement (subject to applicable notice and cure periods as set forth herein), in which event the Deposit shall promptly be delivered to Seller. By its execution hereof, the Title Company agrees to hold and apply the Deposit in accordance with the terms and conditions of this Agreement.

**Section 1.2 Transaction Costs.**

(a) Seller shall pay for the cost of the premium for the owner's policy of title insurance, all endorsements thereto, and all associated commitment fees and title examinations; all Seller's attorneys' fees; Seller's accounting and financial advisor costs, tax certification fees; all recording fees; fifty percent (50%) of deed preparation fees, escrow closing fees, conveyance, transfer, and stamp fees and taxes (including any such taxes on the deeds delivered at Closing); recording fees for mortgage releases or other lien releases; accrued but not yet due taxes, assessments, and fees for the Property; and any and all other fees of Seller related to Closing.

(b) As between Seller and Purchaser, Purchaser shall be responsible for the costs of the premium for any lender's policy of title insurance and associated mortgagee commitment fees; all other acquisition financing costs; fifty percent (50%) of deed preparation fees, escrow closing fees, conveyance, transfer, and stamp fees and taxes (including any such taxes on the deeds delivered at Closing); and all Purchaser's attorneys' fees. Except as otherwise set forth herein, Purchaser also shall pay for all costs of the due diligence on the Property for which Purchaser is responsible hereunder, including, without limitation, building condition inspection fees, termite and pest inspection fees, costs of the survey, appraisal, environmental reports, zoning reports, and any other fees or expenses associated with Purchaser's due diligence of or on the Property (collectively, "**Purchaser's Transaction Costs**").

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

**Section 1.3 Taxes.** General ad valorem taxes, including any municipal assessments or fees, for the then current year relating to the Property, if any, shall be prorated as of the Closing Date based on the last available tax or assessment amounts, and the proration shall be final. All special taxes or assessments, for the Property, if any, due and applicable to periods subsequent to the Closing Date shall be paid by Purchaser, as and when they become due.

**Section 1.4 Reserved.**

**Section 1.5 Risk of Loss.** The risk of loss, damage or destruction to the Property and any improvements thereon through condemnation, fire, or otherwise shall be borne by Seller until Closing. In the event any portion of the Property is damaged or destroyed by any casualty, or taken, or threatened to be taken, by any governmental authority under the power of eminent domain, prior to Closing, then, by written notice to Seller prior to the Closing Date, Purchaser may elect to terminate this Agreement and receive a full refund of the Deposit, whereby Purchaser shall have no further obligations or liabilities relating to the Property, except as expressly set forth herein. In the event that Purchaser elects to close on the Property following a casualty, taking or threatened taking under the power of eminent domain, then at Closing (and as a condition of Purchaser's obligation to proceed with Closing), Seller shall assign to Purchaser all of Seller's right, title and interest in and to the following, as applicable: (i) with respect to any damage or destruction by casualty, all proceeds of any insurance carried by Seller (or which is required to be carried by Seller hereunder) and paid or payable with respect to such destruction or damage, and (ii) with respect to any such taking by any governmental authority under the power of eminent domain, all condemnation awards or proceeds paid or payable with respect to such taking.

**Section 1.6 Closing.** The closing of this transaction (**"Closing"**) shall be held at the offices of the Title Company or such other place and at such time as may be mutually agreed upon by the parties not later than fifteen (15) days following the later to occur of (i) the expiration of the Inspection Period, or (ii) the satisfaction or waiver of all Closing conditions specified in Article 5 below (**"Closing Date"**).

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as of the Effective Date and as of the Closing Date as follows:

**Section 2.1 Authority.** Seller has full power and authority to make and perform this Agreement. The execution, delivery, and performance of this Agreement by Seller does not conflict with any contract, agreement, or indenture to which Seller is a party, or any laws, regulation, or order applicable to Seller.

**Section 2.2 Enforceability of Agreement.** This Agreement has been duly executed by Seller, and this Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable in accordance with its terms.

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

**Section 2.3 No Proceedings.** There are no legal actions, suits or other legal or administrative proceedings, including zoning, association, building, or condemnation matters, pending or threatened against the Property, and Seller has no knowledge of any facts that might result in any action, suit, or other proceeding. No actions or proceedings involving Seller that might materially or adversely affect title to the Property or any part thereof, or cause a lien or encumbrance to attach thereto, or otherwise adversely affect this Agreement in any way, are pending, and to the best of Seller's knowledge, none is threatened in any court or administrative agency.

**Section 2.4 Fee Title.** Seller has good and marketable fee simple title to the Property, subject only to the Permitted Encumbrances (as hereinafter defined). To the best of Seller's knowledge, all utility service lines serving the Property are located within the lot lines of the Property or within lands dedicated to public use or recorded easements for the same, and no such lines cross other private Property unless the same are installed pursuant to recorded easements. Seller (a) has no knowledge of any off-record or undisclosed legal or equitable interest in any part of the Property owned by any other person or entity, and (b) has not granted or entered into any commitments or other agreements, including without limitation, any right of first refusal or option to purchase, term sheet or letter of intent, with or in favor of any third party, which would prevent Seller from consummating the sale of the Property to Purchaser or which would bind Purchaser subsequent to the purchase of the Property by Purchaser. For purposes of this Agreement, "**Permitted Encumbrances**" shall mean (x) general real estate taxes for the year of Closing and subsequent years not yet due and payable, (y) applicable zoning laws and regulations meeting the conditions set forth in Section 5.1(f) hereof, and (z) all easements, conditions, reservations, licenses, and restrictions (other than mortgages, deeds of trust or other liens that Seller must terminate or remove at or prior to Closing) and other imperfections of title that appear of record, any of which do not, individually or in the aggregate, materially impair the value or impair the use and operation of the Property as behavioral and mental health facilities, and which Seller does not agree to cure pursuant to Section 4.2 hereof.

**Section 2.5 Leases and Tenants.** Except for the rights of the Residents being provided Services at the Property pursuant to the Lease, there are no rights of possession, use, or occupancy in the Property outstanding in third persons by reason of recorded or unrecorded leases, land contracts, sales contracts, options, licenses, use agreements or other instruments. All rights of any existing tenants in the Property will be terminated as of the Closing Date.

**Section 2.6 No Liens.** All labor and work performed upon, and all machinery, materials and fuel delivered or furnished to, the Property for improvements thereto within the ninety (90) day period immediately preceding the Closing Date have been or will be paid for as of the Closing Date, and no unpaid improvements, other work, or delivery of materials that might ripen into and form the basis of a mechanics' lien have been or will be made to the Property within such ninety (90) day period.

**Section 2.7 Association and Condemnation Proceedings.** Seller has not (a) received or been notified of any complaints or other proceedings taken or threatened by an association against the Property, which have not been mutually resolved or settled by Seller and the applicable association, or (b) been notified of any condemnation proceedings against the Property, or of any

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

contemplated improvements by public or governmental authority the cost of which is to be assessed as special taxes against the Property in the future.

**Section 2.8 Environmental.** Seller represents and warrants that (a) the Property has never and does not currently contain, nor is it contaminated by either (A) toxic mold or (B) any hazardous or toxic waste materials in violation of any currently applicable environmental law or regulation, including without limitation, Section 103 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended from time to time, or applicable state or local law; (b) the Property has not been used in connection with the storage, disposal or disbursement thereon of any hazardous or toxic materials or substances except in compliance with applicable law; and (c) no "clean-up" (as the term is used in applicable environmental laws) of the Property has occurred or been ordered pursuant to orders by the Federal Environmental Protection Agency or applicable state or local environmental protection agency under any applicable federal or state environmental laws and regulations, which could give rise to (A) any liability on the part of Seller or Purchaser to reimburse any governmental authority or other person for the cost of the clean-up or (B) a lien or encumbrance on the Property; and (iv) Seller has disclosed to Purchaser the location of all underground storage tanks on the Property known to Seller (if any). Seller has provided Purchaser with a copy of any and all notices or communications, if any, that it has received that suggest that potential environmental problems may exist on the Property. Seller shall indemnify, defend and hold Purchaser, its officers, employees and agents, harmless from and against any and all claims, demands, judgments, damages, penalties, fines, costs, loss or expenses (including reasonable attorney, consultant and expert fees) that arise as a result of (x) Seller's breach of the representations, covenants or warranties under this Section 2.8 or (y) the presence or discharge of hazardous or toxic materials or substances from, on, or in the Property as a result of any activity by Seller, its agents, employees and contractors. Without limiting the generality of the foregoing, this indemnification by Seller shall include costs incurred in connection with any site investigation or any remedial, removal, or restoration work resulting from the events indemnified against.

**Section 2.9 No Brokers.** Seller represents and warrants to Purchaser that no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transaction contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 2.10. Improvements.** Except as may have been disclosed by Seller to Purchaser in a written disclosure, Seller does not know of any improvements made to the Property which were made without required permits or made pursuant to permits which have not been properly closed.

**Section 2.11 Consents.** This Agreement and the consummation of the transaction contemplated hereby are not subject to any authorization, consent, approval, or review of any governmental body, regulatory authority, and/or other third party.

**Section 2.12 Compliance with Laws.** (i) To Seller's knowledge, the Property is in compliance with all applicable laws, regulations (including all building and fire codes), ordinances (including zoning ordinances), private restrictions, permits, licenses, and orders, (ii) Seller has not

received written notice that there are any violations of applicable laws, regulations (including all building and fire codes), ordinances (including zoning ordinances), private restrictions, permits, licenses, and orders, and (iii) Seller possesses all authorizations, approvals, certifications and certificates, licenses and permits necessary and required of Seller to provide Services at each Property ("**Approvals**"), which Approvals are in full force and effect as of the Effective Date and shall remain in full force and effect through the Closing Date.

**Section 2.13 Material Contracts.** After the Closing, Purchaser will not be subject to any contractual obligations entered into by Seller with respect to the Property.

**Section 2.14 Taxes.** There are no deficiencies, assessments, or other delinquent taxes with respect to the Property. There are no encumbrances for taxes on the Property.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as of the Effective Date and as of the Closing Date as follows:

**Section 3.1 Organization and Authority.** Purchaser is duly organized and validly existing under the laws of the state of its formation. Purchaser has full power and authority to make and perform this Agreement. The execution, delivery, and performance of this Agreement by Purchaser have been duly authorized and do not conflict with any provisions of the governing or other organizational document of Purchaser, any contract, agreement, or indenture to which Purchaser is a party or any law, regulation, or order applicable to Purchaser.

**Section 3.2 Enforceability of Agreement.** This Agreement has been duly executed by Purchaser, and assuming due execution of this Agreement by Seller, this Agreement constitutes the legal, valid, and binding obligation of Purchaser, enforceable in accordance with its terms.

**Section 3.3 No Broker.** Purchaser represents and warrants to Seller that no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transaction contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.

## ARTICLE IV.
## COVENANTS

**Section 4.1 Conduct of Seller Prior to Closing.** From the Effective Date until the Closing, except as otherwise provided in this Agreement or consented to in writing by Purchaser, Seller shall, at no expense to Purchaser:

(a) Maintain the Property, or cause the Property to be maintained, in good condition and repair and in the same or better condition as the Property was in on the Effective Date, ordinary wear and tear excepted;

(b) Maintain, or cause to be maintained, in full force and effect all insurance policies relating to the Property, including, without limitation, maintaining the current level of property and general liability insurance coverage on the Property;

(c) Maintain the Property, or cause the Property to be maintained, in compliance with any association or other regulatory requirements applicable to the Property;

(e) Pay its debts, taxes, assessments, and other obligations when due;

(f) Perform, or cause to be performed, all obligations under all material contracts relating to or affecting the Property, including the Lease; and

(f) Comply, or cause compliance, with all applicable laws, rules, and regulations.

**Section 4.2 Actions Pending Closing.**

(a) Seller shall, within three (3) business days following the Effective Date, (i) deliver to Purchaser copies of all title commitments and policies, title exception documents, existing surveys, property condition reports, appraisals, environmental reports, zoning information, guarantees and warranties, and all existing as-built plans and specifications in the possession or control of Seller with respect to the Property; (ii) if the Property is located within a flood zone, deliver to Purchaser the flood elevation certificate; and (iii) deliver to Purchaser any other documents relating to the Property reasonably requested by Purchaser (collectively, "**Due Diligence**").

(b) Purchaser shall have sixty (60) days following the Effective Date in which to (i) conduct or cause to be conducted any and all tests, studies, surveys, appraisals, inspections, reviews, assessments, or evaluations of the Property, and (ii) determine if Purchaser's Conditions (as defined below) have been satisfied or may be waived by Purchaser. In the event that any of Purchaser's Conditions has not been satisfied within the 60-day period, Purchaser may, in its sole discretion, by giving written notice thereof to Seller, extend the 60-day period for an additional ten (10) days (said 60-day period, as it may be extended to 70 days or further hereunder, shall hereinafter be referred to as the "**Inspection Period**").

(c) Seller grants Purchaser (and its officers, employees, agents, representatives and vendors) the right to enter upon the Property for purposes of inspecting and obtaining surveys, appraisals and environmental site assessments, inspections, and tests (collectively, "**Environmental Tests**"), and other inspections, investigations, and reports of the Property at Purchaser's discretion. Purchaser must give Seller at least forty-eight (48) hours prior notice of any requested entry or inspection of the Property, which must be during normal business hours. .In connection with all such entries and inspections, Purchaser shall indemnify Seller against any loss, claim or damage resulting from the actions of Purchaser or its agents at the Property while conducting the inspections.

(d) Seller shall promptly notify Purchaser of any Material Adverse Effect on the Property and shall provide Purchaser with any documentation it possesses or receives related thereto. For purposes of this Agreement, "**Material Adverse Effect**" means any event, occurrence, fact, condition, or change that is, or could reasonably be expected to become,

materially adverse to (i) the condition of the Property, (ii) the value of the Property, or (iii) the ability of Seller to consummate the transaction contemplated hereby on a timely basis.

(e) Purchaser shall obtain a title insurance commitment ("**Title Commitment**") covering the Property from the Title Company in order to have an owner's title insurance policy issued to Purchaser in the amount of the Purchase Price effective on the Closing Date (as adjusted pursuant to the terms of this Agreement). Purchaser, at its election, may obtain a loan policy issued to Purchaser's lender, if any. If the Title Commitment shows any exceptions to title that are not acceptable to Purchaser ("**Title Objections**"), Purchaser shall notify the Title Company and Seller, or Seller's representative, in writing, of the Title Objections within the Inspection Period. In the event Purchaser does not provide notice of any Title Objections within the Inspection Period then those items contained in the Title Commitment shall be deemed Permitted Encumbrances. In the event Purchaser raises Title Objections and Seller fails or refuses to cure Purchaser's Title Objections within fifteen (15) days following receipt of notice, then Purchaser may take one or more of the following actions: (i) by written notice to Seller, give Seller additional time to remove the Title Objections and, if necessary, extend the Closing Date, (ii) waive the Title Objections and proceed with the transaction, or (iii) terminate this Agreement in which event the Deposit shall be returned to Purchaser and neither party shall have any further obligation with respect to this Agreement except as otherwise set forth herein. Any mortgage, security deed, lien, judgment, or other claim in a liquidated amount against Seller or the Property (whether or not the same is disclosed in the Title Commitment or listed in Purchaser's Title Objections) shall not in any event be a Permitted Encumbrance and shall be discharged by Seller at or before Closing. If, at any time after the date of the Title Commitment, any new title matters arise out of the acts of anyone other than Purchaser, or Purchaser discovers any title matters that were not disclosed by the Title Commitment (collectively, the "**New Matters**"), any of which affects the title to the Property or the right or power of Seller to perform its obligations under this Agreement, the existence of the New Matters shall constitute a Title Objection governed by this provision.

(f) Purchaser may obtain a survey (the "**Survey**") of the Property as may be required by Purchaser, any lender of Purchaser, or the Title Company, made by a licensed surveyor, bearing the legal description of the Property, and the Survey shall not disclose any condition that could adversely affect the ability to finance or use the Property. Purchaser shall notify Seller of any adverse Survey condition ("**Survey Objection**") in the same manner as a Title Objection. Any Survey Objection shall be handled in accordance with the procedures set forth in Section 4.2(e) above for Title Objections, and any new matter of survey that was not disclosed by the initial Survey of the Property shall be handled in accordance with the procedures set forth in Section 4.2(e) above for New Matters.

(g) If the Environmental Tests reveal the existence of any hazardous or toxic materials or substances (as described in Section 2.8 of this Agreement) on or under the Property, contained in any building materials used in the improvements or any other recognized environmental condition that would or could adversely affect the value of the Property or Purchaser's ability to finance or use the Property ("**Environmental Objection**"), Purchaser may (i) terminate this Agreement and receive a refund of the Deposit, or (ii) proceed with additional environmental testing as recommended by Purchaser's environmental consultant. In the event additional testing is recommended, the Inspection Period will automatically be extended for the period of time required to conduct the additional Environmental Tests.

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

(h) Purchaser shall obtain a building condition inspection report of the Property (**"Building Condition Report"**), which shall be acceptable to Purchaser in its sole discretion. If the Building Condition Report reveals repairs to be made to the Property, Purchaser shall provide a copy of the Building Condition Report to Seller.

(i) Immediately prior to Closing, Purchaser shall have the right to make a final inspection of the Property (**"Final Inspection"**) to determine, in its sole discretion that the Property is in good condition and repair.

## ARTICLE V. CLOSING

**Section 5.1 Conditions to Obligations of Purchaser.** The obligations of Purchaser to consummate the transaction contemplated by this Agreement shall be subject to the fulfillment, or Purchaser's waiver, in Purchaser's sole discretion, at or prior to the Closing, of each of the following conditions (**"Purchaser's Conditions"**):

(a) Purchaser shall have determined that the Property is in good condition and repair as of the Closing Date;

(b) Purchaser shall have obtained an appraisal of the Property satisfactory to Purchaser and of at least the amount required in Section 1.1(a) above;

(c) Purchaser shall have obtained consent to consummate the transaction from its Board of Directors;

(d) Purchaser shall have obtained from the Title Company a Title Commitment covering the Property, and a title insurance policy issued to Purchaser in the amount of the Purchase Price, and a loan policy issued to Purchaser's lender, if any, with all Title Objections thereto having been resolved to the reasonable satisfaction of Purchaser;

(e) Purchaser shall have obtained a Survey for the Property, and all Survey Objections, if any, shall have been resolved to the satisfaction of Purchaser (in its sole discretion);

(f) Purchaser shall have determined that the Property is properly zoned for Purchaser's intended use or that a conditional use or zoning variance may be obtained in a reasonable amount of time and at a reasonable cost, and that the Property is in compliance with applicable private restrictions;

(g) Purchaser shall have obtained termite and pest inspections of the Property, satisfactory to Purchaser;

(h) Purchaser shall have received a satisfactory Building Condition Report of the Property;

(i) Provider, on or before the Closing Date, shall have executed and delivered the Lease for the Property in form and substance satisfactory to Purchaser;

(j) Purchaser shall have obtained Environmental Tests for the Property and all environmental objections, if any, shall have been resolved to the satisfaction of Purchaser;

(k) Seller shall have terminated any existing leases, if any, for the Property as of the Closing Date;

(l) Purchaser, on or before the Closing Date, shall have obtained from Provider information from officers, employees, and other agents of Provider and applicable federal or state agencies ("**Agencies**") to determine that Provider (i) is in good standing with the Agencies; (ii) will not be terminated from any funding program applicable to the Property; and (iii) has a present intent and ability to provide Services to the Residents who will be residing and receiving such services at the Property;

(m) The representations and warranties of Seller shall be true, complete and correct on the Closing Date;

(n) There shall not have been any Material Adverse Effect on the Property;

(o) The results of the Final Inspection shall be satisfactory to Purchaser in its sole discretion; and

(p) Seller shall have performed all material terms, covenants and obligations required of Seller under this Agreement.

**Section 5.3 Conditions to Obligations of Seller**. The obligations of Seller to consummate the transaction contemplated by this Agreement shall be subject to the fulfillment, or Seller's waiver, at or prior to the Closing, of each of the following conditions ("**Seller's Conditions**"):

(a) The representations and warranties of Purchaser shall be true, complete and correct in all material respects on the Closing Date; and

(b) Purchaser shall have performed all material terms, covenants and obligations required of Purchaser under this Agreement.

**Section 5.4 Closing Deliveries**. Upon the satisfaction or applicable waiver of the conditions to Closing listed in this Article V, at Closing, each party shall deliver or cause to be delivered, as applicable, the following:

(a) Seller shall deliver to Purchaser the duly executed terminations for any existing leases for the Property.

(b) Purchaser shall deliver to Seller the Purchase Price (as adjusted pursuant to the terms of this Agreement) through immediately available funds by wire transfer or similar means to the Title Company or escrow agent to be disbursed to an account designated by Seller.

(c) Seller shall deliver to Purchaser the duly executed and acknowledged (i) warranty deed conveying the Property to Purchaser, subject only to the Permitted Encumbrances (and to the extent the legal description on the Survey of the Property differs from the legal description in the Property's chain of title, Seller shall deliver a quitclaim deed for the Property using the Survey legal description), and (ii) deeds of release to release any lien (including without

limitation, mortgages, deeds of trust, tax and mechanics' liens) that may encumber the Property, other than Permitted Encumbrances.

(c) Seller shall deliver to Purchaser possession of the Property, free of tenancies or any other rights of possession, with the exception of the Lease and any Residents being provided Services at the Property.

(d) Seller shall deliver to Purchaser a non-foreign seller affidavit as required by Section 1445 of the Internal Revenue Code of 1986, as amended.

(e) Seller shall deliver affidavits in form and content as may be reasonably necessary to enable the Title Company to delete the pre-printed exceptions listed in the Title Commitment and to satisfy any other Seller title requirements.

(f) Seller, Purchaser, and Title Company, as escrow agent, shall execute and deliver the Escrow Holdback Agreement (as defined in Section 6.3 hereof), and the amount of the Escrow Holdback (as defined in Section 6.3 hereof) shall be deposited with Title Company; and

(g) All other documents reasonably necessary or otherwise required by Purchaser, the escrow agent, or the Title Company to consummate the transactions contemplated hereby.

## ARTICLE VI.
## INDEMNIFICATION

**Section 6.1 Survival**. The representations and warranties contained herein shall survive the Closing and delivery of the deeds, and shall remain in full force and effect until twenty-four (24) months from the Closing Date (the "**Survival Period**"); provided that the representations and warranties in Sections 2.1, 2.2, 2.3, 2.4, 2.8, 3.1 and 3.2 shall survive indefinitely.

**Section 6.2 Indemnification**. Seller shall indemnify Purchaser from any losses, liabilities, claims, damages, actions, proceedings, judgements, interest, awards, costs and expenses ("**Indemnifiable Damages**") incurred by Purchaser by reason of or arising out of (a) a breach of any representation or warranty of Seller contained in this Agreement or (b) a breach of any other obligation of Seller under this Agreement. Purchaser must provide written notice of any potential claim for indemnification under this Article VI to Seller within a commercially reasonable amount of time after becoming aware of such claim for indemnification. Purchaser shall indemnify Seller from any Indemnifiable Damages incurred by Seller by reason of or arising out of (a) a breach of any representation or warranty of Purchaser contained in this Agreement or (b) a material breach of any other material obligation of Purchaser under this Agreement. Seller must provide written notice of any potential claim for indemnification under this Article VI to Purchaser within a commercially reasonable amount of time after becoming aware of such claim for indemnification. Notwithstanding the foregoing, the foregoing indemnity of Seller by Purchaser is limited to the amount of the Deposit. Seller's sole remedy pursuant to this Section 6.2 in the event it suffers any Indemnifiable Damages shall be to retain the Deposit, and Purchaser's indemnity of Seller shall be limited to the amount of the Deposit. The terms of this Section 6.2 shall survive the Closing; provided, however, that Purchaser's indemnity of Seller shall terminate and be of no further force

and effect upon either Closing or the termination of this Agreement and payment of the Deposit to either Purchaser or Seller.

**Section 6.3 Escrow Holdback.** During the Inspection Period, should Purchaser determine, in its sole and reasonable discretion, that conditions discovered during the Inspection Period require that a reasonable sum be deposited by Seller into escrow (the "**Escrow Holdback**") to help secure Seller's contingent obligations pursuant to (a) this Article VI in connection with any post-Closing claim for (i) a breach of Seller's representations or warranties, and (ii) any other indemnities of Seller set forth in this Agreement, and (b) the indemnities of Seller under the closing documents delivered by Seller at Closing (collectively, the "**Post-Closing Obligations**"), then Purchaser and Seller shall agree, within five (5) business days of Purchaser's notice to Seller that it requires an Escrow Holdback, on the sum of the Escrow Holdback (not to exceed five percent (5%) of the Purchase Price), and at Closing, Purchaser, Seller, and the Title Company as escrow agent shall enter into a mutually acceptable escrow agreement (such agreement, the "**Escrow Holdback Agreement**") to govern the release of the Escrow Holdback. The Escrow Holdback Agreement shall provide that (x) the date on which the Escrow Holdback will be released to Seller will be the date that is twenty-four (24) months from and after the Closing Date (the "**Escrow Release Date**"), and (y) the then-remaining balance of the Escrow Holdback shall be released to Purchaser immediately in the event that Seller violates any Post-Closing Obligations prior to the Escrow Release Date. In no event shall any Escrow Holdback be deemed to limit Seller's liability under this Agreement. For avoidance of doubt, Purchaser, in Purchaser's sole and absolute discretion, shall have the right and option to pursue recovery for any post-Closing liability of Seller from either the Escrow Holdback or other assets of Seller.

## ARTICLE VII.
## TERMINATION

**Section 7.1 Termination.**

(a) During the Inspection Period, as the same may be extended, if any of Purchaser's Conditions has not been satisfied, or if any condition of the Property is unsatisfactory in Purchaser's sole discretion, or for any other reason as determined by Purchaser in Purchaser's sole discretion, Purchaser may unilaterally terminate this Agreement by delivering written notice of termination to Seller, which notice shall set forth, to the extent Purchaser is terminating by reason of the non-satisfaction of Purchaser's Conditions, the specific conditions that have not been met. In the event that Purchaser terminates this Agreement after the expiration of the Inspection Period in the absence of any material breach of this Agreement by Seller, then Purchaser shall not be entitled to reimbursement of the Deposit unless any one of the following occurs: (a) any of Purchaser's Conditions have not been satisfied as of Closing, (b) Seller has failed to fulfill any of its obligations set forth in Article IV, (c) Purchaser terminates this Agreement pursuant to Section 1.5 hereof, or (d) any other occurrence expressly entitling Purchaser to reimbursement of the Deposit pursuant to the express terms and conditions of this Agreement. The termination notice shall be delivered to Seller no later than three (3) days following the expiration of the Inspection Period. Failure of Purchaser to provide a termination notice within the three (3)-day period shall

be deemed a waiver of Purchaser's right to terminate pursuant to this Section 7.1(a), but shall not waive any of Purchaser's Conditions unless expressly waived by Purchaser in writing.

(b) Purchaser may terminate this Agreement (i) at Closing by written notice to Seller if any of Purchaser's Conditions has not been satisfied, and (ii) at any time by written notice to Seller if Seller has failed to fulfill any of its obligations set forth in Article IV. Seller shall be liable for and promptly pay to Purchaser all of Purchaser's Transaction Costs (as defined in Section 1.2(b) of this Agreement) actually incurred, in an amount not to exceed Thirty Thousand and no/100 Dollars ($30,000.00) if this Agreement is terminated pursuant to this Section 7.1(b).

(c) Seller may terminate this Agreement at Closing by written notice to Purchaser if any of Seller's Conditions has not been satisfied.

**Section 7.2 Effect of Termination.** In the event of the termination of this Agreement in accordance with Section 7.1(b), Seller shall reimburse Purchaser for Purchaser's Transaction Costs actually incurred, in an amount not to exceed Thirty Thousand and no/100 Dollars ($30,000.00), and this Agreement otherwise shall become void and there shall be no liability on the part of any party hereto except as otherwise set forth in this Agreement, and nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

## ARTICLE VIII. MISCELLANEOUS

**Section 9.1 Entire Agreement.** This Agreement (including any exhibits, appendices, and schedules hereto, all of which are specifically incorporated herein by this reference) constitutes the entire understanding between the parties hereto with respect to the sale and purchase of the Property, and there are no representations, oral or written, relating to the Property or this transaction that have not been incorporated herein. For purposes of clarity and the avoidance of doubt, each party expressly disclaims reliance upon any statements outside the text of this Agreement (i.e., extra-contractual statements).

**Section 9.2 Notice.** Each notice, consent, approval or other document required or authorized under this Agreement must be in writing. The notice is sufficient if (a) delivered personally; (b) mailed by certified mail, return receipt requested and postage prepaid; (c) delivered by a nationally recognized overnight courier service; or (d) sent by fax or email with confirmation of receipt provided that a copy is simultaneously delivered by a nationally recognized overnight courier service, to the address set forth under the signature of each party. A party may change its address from time to time by a notice to the other party pursuant to this Section 9.2.

**Section 9.3 Time is of the Essence.** TIME IS OF THE ESSENCE WITH RESPECT TO THE CLOSING OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

**Section 9.4 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Seller may not assign its rights or obligations hereunder without the prior written consent of Purchaser. Purchaser may assign its rights and obligations under this Agreement or delegate a separate entity to take title to the Property at Closing. For purposes of this Section 9.4, a merger,

conversion, restructuring, distribution of substantially all assets, or a change of control shall constitute an assignment.

**Section 9.5 Severability**. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.6 Amendments and Modifications; Waiver**. This Agreement may be amended, modified, or supplemented only by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, and no delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 9.7 Choice of Law; Venue**. This Agreement is governed by, and construed in accordance with, the laws of the state of Michigan. Any actions or proceedings related to this Agreement shall be brought in the state and federal courts located in Saginaw County, Michigan.

**Section 9.8 Dates**. If any date under this Agreement falls on a Saturday, Sunday, or legal holiday, that date shall automatically be extended until the next following business day. For purpose of this Agreement, a "business day" shall mean any day except a Saturday, Sunday, or legal holiday.

**Section 9.9 Force Majeure**. Unless otherwise expressly provided in this Agreement, a party shall not be liable to the other party for delays or failures in performance of any of its obligations under this Agreement because of acts of God; acts of a public enemy; acts of war, whether declared or undeclared; insurrections; riots; fires; explosions; accidents; epidemics; quarantine restrictions or other government mandates; failures of transportation; freight embargoes; strikes or other labor disputes causing work to be stopped, slowed, or interrupted, provided that the delays or failures were beyond that party's reasonable control and were not caused by its fault or negligence. If a delay or failure of performance occurs that is excusable under this provision, the period for performance shall be extended for a time equal to the time lost because of the force majeure.

**Section 9.10 Third-Party Beneficiaries**. Except as otherwise provided herein, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person

or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.11 Legal Representation.** Seller and Purchaser hereby acknowledge that they have each read, understood, and had the opportunity to be advised by legal counsel as to all of the provisions of this Agreement. Should any provision of this Agreement require judicial interpretation, it is agreed that any court interpreting this Agreement shall not apply a presumption that the terms hereof should be construed more strictly against one party than the other by reason of the rule that a document is to be more strictly construed against the party who prepared the document or the initial draft of the document. Both parties acknowledge that this Agreement is the product of negotiations between the parties hereto and that both parties hereto have contributed to the final preparation of the terms and provisions of this Agreement. Typewritten or handwritten provisions inserted in this Agreement and initialed by both parties hereto, and any amendment or addenda initialed or signed by both parties hereto, shall control in the event of any conflict or inconsistency with any other provisions of this Agreement, and handwritten provisions initialed by both parties hereto shall control over typewritten provisions.

**Section 9.12 Waiver of Jury Trial.** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS SECTION.

**Section 9.13 Counterpart Signatures; Electronic Transmissions.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together constitute one and the same document. Delivery of an executed counterpart of this Agreement by facsimile or other electronic means shall be equally as effective as delivery of an original counterpart of this Agreement.

**Section 9.14 Exclusivity.** During the pendency of this Agreement, neither Seller nor its subsidiaries or other affiliated entities, nor any of their respective offices, trustees, directors, shareholders, members, employees, agents, or representatives shall, directly or indirectly, solicit, initiate, or engage in negotiations or discussions with, disclose any of the terms of this Agreement to, accept any offer or backup offer from, furnish any information to, otherwise cooperate, assist or participate with, any person or organization regarding the acquisition, by purchase, merger, lease, or otherwise, of any ownership interest in the Property or any of them ("**Alternate**

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

**Transaction**"). During the pendency of this Agreement, Seller shall promptly notify Purchaser of the receipt of any oral or written offer, indication of interest, proposal, inquiry or other communication relating to an Alternate Transaction, such notice to include the material terms thereof, including the identity of the person or entity or group of persons or entities involved. Seller also shall promptly furnish Purchaser with a copy of any written offer or other information that it receives relating to an Alternate Transaction and shall keep Purchaser full informed on a current basis of any modifications to such offer or information.

**Section 9.15 Confidentiality.** This Agreement, its contents, and the fact of this Agreement shall remain confidential. By execution of this Agreement, each of Seller and Purchaser (each, a "**Party**" and together "**Parties**") agrees to and shall maintain the confidentiality of the other Party's involvement (including the identity of the other Party) in the subject transaction, including without limitation, the fact of the transaction contemplated hereby, the execution and terms of this Agreement, the existence and content of any negotiations related hereto, and the structure and pricing and other terms of the subject transaction (collectively, "**Confidential Information**"). Neither Party shall disclose the Confidential Information to any person or entity other than: (a) on an as-needed basis in specific furtherance of the subject transaction, to that Party's advisors, accountants, attorneys, agents, consultants, permitted assignees, lenders, and potential lenders, and the applicable Party shall inform them of the confidentiality requirements of this Agreement and obtain their written agreement to comply with the terms of each; (b) with respect to any other disclosures required by law; or (c) disclosures consented to by both Parties. Neither Party shall make or allow to be made any public announcement of the subject transaction or the existence of this Agreement without the mutual agreement of the other Party. This paragraph and the covenants herein shall survive Closing or any termination of this Agreement for a period of six (6) months following such Closing or termination.

[Signatures are set forth on the following page.]

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

IN WITNESS WHEREOF, the parties have executed this Purchase and Sale Agreement as of the date set forth above.

**SELLER:**

_______________________(SEAL)
**BRIAN MCHUGH**

**Date:** _______________, **2025**

Address:
_______________________
_______________________
Phone: _________________
Email:_________________

_______________________(SEAL)
**ELIZABETH MCHUGH**

**Date:** _______________, **2025**

Address:
_______________________
_______________________
Phone: _________________
Email:_________________

**PURCHASER:**

**SCIOTO PROPERTIES LLC,**
an Ohio limited liability company

Signed by:
By: B. Thomas Goodwin
B. Thomas Goodwin
Its: President

**Date:** July 17, **2025**

Address:
160 East Olentangy Street
Powell, Ohio 43065
Phone: 614.889.5191
Email: tgoodwin@scioto.com

Docusign Envelope ID: 6834492D-C539-4CE9-8351-4F454588AE04

# EXHIBIT A

The Property

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made and entered into as of May 16, 2025 (the "**Effective Date**"), by and between **BRIAN MCHUGH AND ELIZABETH MCHUGH**, individual residents of the State of Michigan (collectively, "**Seller**"), and **SCIOTO PROPERTIES LLC**, an Ohio limited liability company, or its assignee ("**Purchaser**").

## BACKGROUND INFORMATION

Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller that certain commercial real property consisting of that certain parcel of land in Tuscola County, Michigan and commonly known as **390 E. Deckerville Road, Caro, Michigan 48723**, as more particularly described on **Exhibit A** attached hereto and made a part hereof, together with all easements, rights, and appurtenances relating thereto, and all buildings, improvements and fixtures now or hereafter located thereon, and all of Seller's right, title, and interest in and to any streets, roadways, alleys, and/or sidewalks, both public and private, adjacent thereto (collectively, the "**Property**").

In connection with the purchase of the Property, Purchaser, or its affiliate, as lessor, must receive an executed written lease agreement for the Property (the "**Lease**") with Youth Opportunity Investments LLC, an Indiana limited liability company, or its assignee ("**Provider**"), as lessee. The Lease shall be effective on the Closing Date (as hereinafter defined), and shall be in form acceptable to Purchaser. Pursuant to the Lease, Provider will lease and operate the Property to provide residential treatment, support and related services to individuals with specialized continuing care needs for behavioral and mental health conditions (the "**Services**"). The individuals residing and receiving the Services at the Property are referred to herein as the "**Residents.**"

## STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto acknowledge and agree as to the accuracy of the Background Information, which is incorporated into this Agreement by reference, and hereby agree as follows:

## ARTICLE I.
## PURCHASE AND SALE

### Section 1.1 Purchase and Sale.

(a) Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, on the Closing Date (as hereinafter defined), the Property for a purchase price of One Million Two Hundred Thousand and no/100 Dollars ($1,200,000.00) (the "**Purchase Price**") provided that the property-level financial statements for the Property have been provided by Seller to Purchaser and are reasonably acceptable to Purchaser. The Purchase Price (as adjusted

IN WITNESS WHEREOF, the parties have executed this Purchase and Sale Agreement as of the date set forth above.

**SELLER:**

Brian McHugh (SEAL)
**BRIAN MCHUGH**

**Date:** May 16, **2025**

Address:
376 Gilford Rd
Caro MI 48723
Phone: 989 553 1316
Email: brianmchughlop@gmail.com

Elizabeth McHugh (SEAL)
**ELIZABETH MCHUGH**

**Date:** May 16, **2025**

Address:
376 Gilford Rd
Caro MI 48723
Phone: 989 553 1313
Email: EMchughlop@gmail.com

**PURCHASER:**

**SCIOTO PROPERTIES LLC,**
an Ohio limited liability company

By: ______________________________
B. Thomas Goodwin
Its: President

**Date:** ____________________, **2025**

Address:
160 East Olentangy Street
Powell, Ohio 43065
Phone: 614.889.5191
Email: tgoodwin@scioto.com

# EXHIBIT 2

Docusign Envelope ID: BC05B69C-B268-4099-8913-7B8C1ED4F9D6

# TERMINATION OF PURCHASE AND SALE AGREEMENT

THIS TERMINATION OF PURCHASE AND SALE AGREEMENT (the "**Termination**") is made and entered into effective as of February 13, 2026, ("**Termination Date**") by and between SCIOTO PROPERTIES SP-16 LLC ("**Purchaser**") and BRIAN AND ELIZABETH MCHUGH (collectively, "**Seller**").

Purchaser and Seller are parties to that certain Purchase and Sale Agreement dated on or about July 17, 2025, and all amendments and addenda thereto (the "**Agreement**") for the purchase and sale of that certain parcel of real property commonly known as **390 E. Deckerville Road, Caro, Michigan 48723** ("**Property**").

Purchaser has determined and notified Seller that due to the untimely delays with the zoning and municipality's approval for Purchaser's Special Use Permit, Purchaser is unable to complete the purchase of the Property. The foregoing prohibits the use of the Property for Purchaser's intended purpose.

Purchaser and Seller agree that the Agreement is hereby terminated and shall be deemed null and void and of no further force or effect, the parties are released from any and all rights and obligations in, by and under the Agreement, and the deposit shall be returned to Purchaser.

This Termination may be executed in counterparts by the parties hereto and all such counterparts when taken together shall be deemed to be one original. Delivery of an executed counterpart of this Termination by facsimile or other electronic means shall be equally as effective as delivery of an original counterpart of this Termination.

This Termination has been duly executed by the parties hereto as of the day and year first above written.

**PURCHASER:**
**SCIOTO PROPERTIES SP-16 LLC**
By: Scioto Properties LLC, its member

By: Signed by: B Thomas Goodwin
B. Thomas Goodwin
Its: President

**SELLER:**

BRIAN MCHUGH

ELIZABETH MCHUGH

C:\Users\docusign\AppData\Local\Temp\ABCpdf\7b17400e-17ba-4793-a39b-8eec82745188.doc